**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

|  |  |  |
|---|---|---|
| **FRANCES MILLER, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JENNY MILLER, DECEASED,** | ) ) ) ) ) | **CASE NO. 8:09-CV-1520-T-23TBM** |
| **Plaintiff,** | ) ) | **COMPLAINT AND JURY DEMAND** |
| **v.** | ) ) | |
| **KV PHARMACEUTICAL COMPANY, ETHEX CORPORATION and THER-RX CORPORATION,** | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

**THIRD AMENDED COMPLAINT AND**
**DEMAND FOR JURY TRIAL**

Plaintiff FRANCES MILLER, individually, and as PERSONAL REPRESENTATIVE of

the ESTATE OF JENNY MILLER, Deceased (hereinafter referred to as "Plaintiff"), who was

until the date of her death a citizen of the state of Florida, residing at 9483 Country Rd.,

Brooksville, FL 34614, by and through her undersigned attorneys, hereby sues the Defendants,

KV PHARMACEUTICALS COMPANY, a Delaware Corporation which has its principle place

of business at 2503 South Handley Road, Saint Louis, Missouri, ETHEX CORPORATION, a

Delaware Corporation which has its principle place of business at 3100 Corporate Exchange

Boulevard, Bridgeton, Missouri, and THER-RX CORPORATION, a Missouri Corporation

which has its principle place of business at 1 Corporate Woods Drive, Bridgeton, MO 63044,

allege and state the following:

**Page 1 of 40**

## NATURE OF THE CASE

1.   Plaintiff brings this action against Defendants for wrongful death which was suffered by Decedent, JENNY MILLER, after she used Oxycodone HCL 30 MG tablets (hereinafter referred to as "Oxycodone") that were defectively manufactured and/or distributed by ETHEX CORPORATION (hereinafter referred to as "ETHEX" or collectively with all other named defendants as "Defendants"), KV PHARMACEUTICAL COMPANY (hereinafter referred to as "KV" or collectively with all other named defendants as "Defendants") and THER-RX CORPORATION (hereinafter referred to as "THER-RX" or collectively with all other named defendants as "Defendants").

2.   Defendant, KV designed, researched, manufactured, tested, sought approval by the United States Food and Drug Administration (hereinafter "FDA") and advertised, promoted, marketed, sold and/or distributed Oxycodone tablets through co-Defendants, ETHEX and THER-RX, for the treatment of pain.  Upon information and believe, KV, ETHEX and THER-RX all had a role in the manufacturing, marketing, promoting, distributing and selling of the defective Oxycodone product that is the subject to this lawsuit.

3.   As a result of the negligence of Defendants and the defective nature of the Oxycodone, the drug contains more of the approved level of active ingredient than is appropriate.

4.   As a result of the defective nature of the Oxycodone, the drug increases the risk of nausea, vomiting, dizziness, low blood pressure, respiratory failure, renal failure, death, and other health injuries.

**Page 2 of 40**

5.    At all times relevant hereto, Defendants misrepresented the safety of Oxycodone and negligently designed, manufactured, marketed, advertised, promoted, sold and/or distributed Oxycodone as a safe and effective medication to treat pain.

6.    At all times relevant hereto, Defendants failed to warn of the dangers of Oxycodone including, but not limited to, the fact that the Oxycodone manufactured by Defendants contained more of the approved level of active ingredient than is appropriate.

7.    At all times relevant hereto, Defendants knew, had reason to know, or should have known, that Oxycodone was defective thereby defrauding Decedent, physicians, patients and the population-at-large while accelerating the risk of Oxycodone toxicity leading to, in some patients, nausea, vomiting, dizziness, low blood pressure, respiratory failure, kidney failure, death, and other injuries.

8.    At all times relevant hereto, Defendants knew, had reason to know, or should have known, that its representations that Oxycodone was safe and effective were materially false and misleading.

9.    As a result of the defective nature of Defendants' product, Oxycodone fails to safely treat pain thereby placing patients at an increased risk of serious injury, including death. Defendants knew, had reason to know, or should have known of the defective nature of their product and the resulting risk of injuries and deaths, but failed to warn Decedent and/or her physicians, preventing Decedent, her physicians, and/or the medical community from making informed choices about the selection of pain medications.

10. Upon information and belief, Defendants concealed their knowledge of the defects in their products from the Decedent, her physicians, hospitals, pharmacists and/or the FDA.

**Page 3 of 40**

11. Consequently, Plaintiff seeks compensatory, punitive damages, and all other relief the Court finds just, as a result of Decedent's use of Oxycodone which caused Decedent's death.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds seventy-five thousand dollars ($75,000) exclusive of interest and costs. Venue is proper in this District, because Plaintiff is a resident of this District and Defendants conducts business within the District.

13. At all times relevant hereto, KV was engaged in the business of manufacturing, marketing, promoting, selling, and/or distributing Oxycodone.

14. At all times relevant hereto, ETHEX and THER-RX were engaged in the business of manufacturing, marketing, promoting, selling, and/or distributing Oxycodone.

15. KV, ETHEX and THER-RX placed defective Oxycodone into the stream of interstate and worldwide commerce.

16. As a direct and proximate result of Defendants placement of defective Oxycodone into the stream of commerce, Decedent suffered both economic and noneconomic damages and will continue to suffer such damages indefinitely.

17. Plaintiff has incurred and will continue to incur significant economic and noneconomic damages.

18. At all times relevant hereto, Defendants were present and doing business in the State of Florida and in the Middle District of Florida. At all relevant times, Defendants transacted,

solicited, and conducted business in the State of Florida and derived substantial revenue from such business.

19. At all relevant times, Defendants expected or should have expected that its acts would have consequences within the United States of America, State of Florida, and within this District in particular.

**PARTIES**

20. Plaintiff FRANCES MILLER, is the surviving mother of decedent and has been duly appointed the PERSONAL REPRESENTATIVE of the Decedent's Estate.   The Plaintiff is a resident of the United States of America, State of Florida, County of Hernando.

21. Decedent, JENNY MILLER, was, at all relevant times, a resident of the United States of America, State of Florida, County of Hernando.

22. Decedent, JENNY MILLER, purchased, used, and suffered adverse effects from Oxycodone, including respiratory failure and death, which occurred on or about April 3, 2008.

23. Decedent is survived by her natural parents, FRANCIS and STEVEN MILLER, and two minor children, KML and MEW, III, who all are the wrongful death beneficiaries of JENNY MILLER.

24. Defendant, KV PHARMACEUTICAL COMPANY, is a corporation organized and existing under the laws of the State of Delaware.  Its principal place of business is located at 2503 South Handley Road, Saint Louis, Missouri.  It is engaged in the production of pharmaceutical products, including the subject Oxycodone, sold throughout the United States and in the State of Florida, doing business in the State of Florida and purposely availing itself in those markets.

25. Defendant, ETHEX CORPORATION, is a corporation organized and existing under the laws of the State of Missouri.  Its principle place of business is located at 3100 Corporate Exchange Boulevard, Bridgeton, Missouri.  It is engaged in the production of pharmaceutical products, including Oxycodone, sold throughout the United States and the State of Florida, doing business in the State of Florida and purposely availing itself in those markets.

26. Defendant, THER-RX CORPORATION, is a corporation organized and existing under the laws of the State of Missouri.  Its principal place of business is located at 1 Corporate Woods Drive, Bridgeton, MO 63044.  It is engaged in the production of pharmaceutical products, including Oxycodone, sold throughout the United States and in the State of Florida, doing business in the State of Florida and purposely availing itself in those markets.

## GENERAL ALLEGATIONS

27. On June 9, 2008, the FDA announced that ETHEX and THER-RX, subsidiaries of KV, were recalling a single lot of morphine sulfate 60 mg extended release tablets due to the possibility that oversized tablets may have been released at the wholesale and retail levels.

28. The FDA reported in the recall notice that the "[o]versized tablets may contain as much as two times the labeled level of active morphine sulfate." [http://www.fda.gov/oc/po/firmrecalls/ethex06_08.html]

29. Initially, Defendants' recall notice asserted that no other dosage strength or other lot of the 60 mg strength was affected by the recall.  *Id*.

30. According to the Defendants' own FDA press release "opioids such as morphine have life-threatening consequences if overdosed. Those consequences can include respiratory depression (difficulty or lack of breathing), and low blood pressure."  *Id*.

**Page 6 of 40**

31. On June 13, 2008, the FDA announced that Defendants had expanded their earlier recall to include numerous Morphine lots manufactured from June 2006 through May 2008.

32. On December 23, 2008, Defendants announced a recall of their Hydromorphine HCl 2mg tablets (lot # 90219, Exp. 03/2010, NDC # 58177-0620-04).

33. On or about January 28, 2009, Defendants expanded their recall to include additional generic products, including Propafenone HCl, Isosorbide Mononitrate extended release tablets, Morphine extended and immediate release tablets and Dextroamphetamine sulfite. The announcement warned that the tablets may have been manufactured with more than the intended dose and that "overdoses can include arrhythmias and low blood pressure with Propafenone HCl; fainting and low blood pressure with Isosorbide Mononitrate; respiratory depression and low blood pressure with Morphine Sulfate; and rapid heart rate and high blood pressure with Dextroamphetamine Sulfate" all of which could result in death.

34. On January 28, 2009, the Defendants announced another recall, which included the subject Oxycodone, as well as all other drugs manufactured by Defendants. The recall was initiated as a result of the tablets being oversized which can result in respiratory depression, low blood pressure and death.

35. In February of 2009, the Defendants expanded the recall yet again which included the recall of prescription iron and prenatal supplements.

36. Defendants eventually suspended shipments for all FDA-approved drugs. In total, more than 60 products were suspended from the market as a result of the Defendants' products containing more active ingredients than is appropriate, including Defendants' narcotics, cardiac drugs and prenatal and iron supplement products.

37. On or about March 2, 2009, the FDA announced a Consent Decree of permanent injunction enjoining Defendants, KV PHARMACEUTICAL COMPANY and its subsidiaries ETHEX CORPORATION and THER-RX CORPORATION, and their principle officers, from manufacturing and distributing adulterated and unapproved drugs.

38. On or about February 25, 2010, KV PHARMACEUTICAL COMPANY'S generic unit, Defendant ETHEX CORPORATION, pled guilty to two criminal charges that it failed to promptly inform regulators about dangerous manufacturing problems and was ordered to pay restitution in excess of twenty-five million dollars ($25,000,000).

39. The recalls discussed above, which occurred at the wholesale and retail levels, and FDA action discussed herein occurred as a result of the Defendants violation of Federal Regulations, including current Good Manufacturing Practices.

40. Defendants negligently designed, manufactured, marketed, advertised, promoted, sold and/or distributed Oxycodone which was unreasonably dangerous in normal use in that the defective drug has more of the approved level of active ingredient than is appropriate.

41. Defendants failed to adequately warn users of the defective drug of its unreasonably dangerous characteristics.

42. Defendants owed a legal duty to Decedent to manufacture and sell Oxycodone without hidden and concealed defects.

43. Defendants breached such duty which proximately caused Decedents' injuries, including her death.

44. Defendants knew or, in the exercise of reasonable care, should have known that its drug was defective and that consumers, such as Decedent, might have reasonably been expected to use the drug and be affected by its defective condition.

45. This defective condition is a direct and proximate cause of Decedent's injuries.

**COUNT I**
**NEGLIGENCE**
**(AGAINST DEFENDANTS KV PHARMACEUTICAL COMPANY, ETHEX CORPORATION AND THER-RX CORPORATION**

46. Plaintiff repeats, reiterates, and realleges paragraphs 1-45 of this Complaint with the same force and effect as if fully set forth herein.

47. Defendants had a duty to exercise reasonable care in manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Oxycodone into the stream of commerce, including a duty to assure that the product would work as intended, marketed, promoted, and/or advertised and/or did not cause users to suffer unreasonable, dangerous side effects.

48. Defendants failed to exercise ordinary care in the manufacturing, marketing, supplying, promoting, packing, sale, testing, quality assurance, quality control and/or distribution of Oxycodone into interstate commerce in that Defendants knew or should have known that the product was defective, did not function as intended and/or created a high risk of unreasonable, dangerous side effects, including, but not limited to, nausea, vomiting, dizziness, low blood pressure, respiratory failure, kidney failure, and death, as well as other severe and permanent health consequences.

49. The negligence of the Defendants, their agents, servants, and/or employees, included, but was not limited to, the following acts and/or omissions:

**Page 9 of 40**

a)   manufacturing, producing, promoting, formulating, creating and/or designing Oxycodone without thoroughly testing it;

b)   manufacturing, producing, promoting, formulating, creating and/or designing Oxycodone without adequately testing it;

c)   not conducting sufficient testing programs to determine whether or not the aforesaid product was safe for use in that Defendants knew or should have known that Oxycodone was unsafe and unfit for use by reason of the dangers to its users and/or because of the negligent manufacturing of the product;

d)   selling Oxycodone without making proper and sufficient tests to determine the dangers to its users;

e)   negligently failing to adequately and correctly warn the Decedent, the public, the medical and healthcare profession, and/or the FDA of the dangers and negligent manufacture of Oxycodone;

f)   negligently failing to recall or otherwise notify users at the earliest date that it became known that said product was, in fact, dangerous and defective;

g)   failing to test Oxycodone and/or failing to adequately, sufficiently and properly test Oxycodone;

h)   negligently advertising and recommending the use of the aforesaid drug without sufficient knowledge as to its manufacturing defect and dangerous propensities;

i)   negligently representing that Oxycodone was safe for its intended purpose when, in fact, its safety is questionable;

j)   negligently manufacturing Oxycodone in a manner which was dangerous to its users;

k)   negligently designing Oxycodone in a manner which was dangerous to its users;

l)   negligently producing Oxycodone in a manner which was dangerous to its users;

m)   negligently assembling Oxycodone in a manner which was dangerous to its users;

n)   concealing information concerning reports of adverse effects from the Decedent in knowing that Oxycodone was unsafe, dangerous and non-conforming with accepted industry standards; and

o)   improperly concealing and/or misrepresenting information from the Decedent, her healthcare professionals and/or the public, concerning the severity of risks and dangers of Oxycodone and/or the manufacturing defect.

50. Defendants under-reported, underestimated and/or downplayed the serious dangers and the defective nature of Oxycodone.

51. Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Oxycodone in that they:

a)   failed to use due care in designing and manufacturing Oxycodone so as to avoid the aforementioned risks when Oxycodone was used for its intended purpose;

b)   failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or defective nature of Oxycodone;

c)  failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Oxycodone given its defective nature;

d)  failed to warn Decedent  of the severity and duration of such adverse side effects, as the warnings given did not accurately reflect the defective nature of the product;

e)  failing to conduct testing, including clinical testing and post-marketing surveillance to determine the safety of Oxycodone;

f)  failing to warn Decedent prior to actively encouraging the sale of Oxycodone, either directly or indirectly, orally or in writing, about the defective nature of the product; and

g)  were otherwise negligent.

52. Upon information and belief, despite the fact that Defendants knew or should have known that Oxycodone caused unreasonably dangerous side effects due to its manufacturing defect, Defendants continued to market, manufacture, distribute and/or sell Oxycodone to consumers, including the Decedent.

53. Defendants knew or should have known that consumers such as Decedent would foreseeably suffer injury, both physical and economic, and/or be at an increased risk of suffering injury as a result of Defendants' failure to exercise ordinary care, as well as Defendants' negligent manufacturing process, as set forth above.

54. Defendants knew or should have known that consumers such as the Decedent would foreseeably suffer injury, and/or be at increased risk of suffering injury, including personal

injuries and financial harm, as a result of Defendants' failure to exercise ordinary care, as well as Defendants' negligent manufacturing process, as set forth above.

55. Defendants' negligence was the proximate cause of Decedent's injuries, harm and economic loss which she suffered.

56. As a direct and proximate result of the forgoing, Decedent died.

57. WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT II
## NEGLIGENCE *PER SE*
## (AGAINST DEFENDANTS KV PHARMACEUTICAL COMPANY, ETHEX CORPORATION AND THER-RX CORPORATION)

58. Plaintiff repeats, reiterates, and realleges paragraphs 1-45 of this Complaint with the same force and effect as if fully set forth herein.

59. Defendants have an obligation not to violate the law.

60. Defendants have violated the Federal Food, Drug and Cosmetic Act, 21, U.S.C. 331(a) by introducing and causing to be introduced, and delivering and causing to be delivered for introduction into the interstate commerce articles of drugs, as defined by 21 U.S.C. § 321(g)(1) (hereafter "drug" or "drugs"), that are adulterated within the meaning of 21 U.S.C. § 351(a)(2)(B), in that they have been manufactured, processed, packed, labeled, held, and distributed in violation of current good manufacturing practice ("CGMP") requirements, 21 U.S.C. § 351(a)(2)(B) and 21 C.F.R. Parts 210 and 211.

61. Defendants violated 21 U.S.C. § 331(k), by causing the adulation within the meaning of 21 U.S.C. § 351(a)(2)(B) of articles of drugs after shipment of one or more of their components in interstate commerce.

62. Defendants violated 21 U.S.C. § 331(d), by introducing and causing to be introduced, and delivering and caused to be delivered for introduction, into the interstate commerce new drugs, as defined by 21 U.S.C. § 321(p), that are neither approved pursuant to 21 U.S.C. § 355(a), nor exempt from approval pursuant to 21 U.S.C. § 355(i).

63. Defendants violated 21 U.S.C. § 331(a), by introducing or delivering, or causing to be introduced or delivered, into the interstate commerce drugs that are misbranded within the meaning of 21 U.S.C. § 352(f)(l).

64. Defendants violated 21 U.S.C. § 331(k), by causing drugs that Defendants hold for sale after shipment of one or more of their components in interstate commerce to become misbranded within the meaning of 21 U.S.C. § 352 (f)(l),

65. The Decedent, as a purchaser and consumer of Oxycodone, is within the class of persons that the aforementioned statues are designed to protect.

66. Injury due to false, misleading and/or reckless advertising and promotion, and misbranding, misleading products and as otherwise set forth in this complaint is the specific type of harm these statutes are designed to prevent.

67. Defendants are responsible to Decedent for injuries incurred for their violations of the statutes described above under the doctrine of negligence per se.

68. As a direct and proximate result of the negligence and negligence per se of Defendants and each one individually and as a result of the Defendants' actions and/or inactions

as set forth in this complaint, the Decedent died. The Plaintiff seeks actual and punitive damages from the Defendants as alleged herein.

68. WHEREFORE, Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**COUNT III**
**MANUFACTURING DEFECT**
**(AGAINST DEFENDANTS KV PHARMACEUTICAL COMPANY, ETHEX**
**CORPORATION AND THER-RX CORPORATION)**

70. Plaintiff repeats, reiterates, and realleges paragraphs 1-45 of this Complaint with the same force and effect as if fully set forth herein.

71. At all time material to this action, Defendants were engaged in the business of designing, developing, manufacturing, rebranding, labeling, marketing, distributing and/or selling the subject Oxycodone.

72. At all times material to this action, the subject Oxycodone was expected to reach and did reach, consumers in the State of Florida, including the Decedent herein, without substantial change in the condition in which it was sold.

73. Defendants sold and/or distributed the subject Oxycodone in a condition that posed unreasonable risks from reasonably anticipated use.  The subject Oxycodone was expected to and did reach Decedent without substantial change in condition from the time that it left the control of the Defendants.

74. The defective conditions alleged herein rendered the subject Oxycodone unreasonably dangerous to the Decedent and proximately caused the injuries, death, and damages for which this lawsuit seeks recovery.

**Page 15 of 40**

75. At all times material to this action, the subject Oxycodone was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but not limited to, on or more of the following particulars:

a) When placed in the stream of commerce, the subject Oxycodone contained manufacturing defects which rendered the product unreasonably dangerous;

b) The subject product's manufacturing defects occurred while the product was in the possession and control of each of the Defendants;

c) The subject product was not made in accordance with Defendants' specifications or performance standards; and

d) The subject product's manufacturing defects existed before it left the control of Defendants.

76. As a direct and proximate result of the subject product's manufacturing defects, the Decedent died. The Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

77. WHEREFORE, Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**COUNT IV**
**FAILURE TO WARN**
**(AGAINST DEFENDANTS KV PHARMACEUTICAL COMPANY, ETHEX CORPORATION AND THER-RX CORPORATION)**

**Page 16 of 40**

78. Plaintiff repeats, reiterates, and realleges paragraphs 1-45 of this Complaint with the same force and effect as if fully set forth herein.

79. Defendants knew, or in the light of reasonably available knowledge, should have known, of the danger in the subject Oxycodone that caused the damage for which recovery is sought.   The ordinary user or consumer of subject product would not have realized such dangers.

80. Defendants neglected to provide Decedent with warnings that reasonably could have been expected to catch the attention of a reasonably prudent person under similar circumstances taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product.   Further, Defendants failed to provide warnings which could accurately advise ordinary consumer of the scope, severity and likelihood of serious injury resulting from use of its product.   Had such warnings been provided, the injuries and damages sustained by Decedent could have been avoided.

81. Defendants neglected to provide Decedent's prescribing physician with adequate warnings to accurately advise such physician of the increased severity and likelihood of serious injury resulting from the prescribing and ingestion of the subject Oxycodone to patients such as Decedent.

82. Defendants' product failed to function as expected and there existed feasible design alternatives equally effective and useful that would have had a reasonable probability of preventing the harms sustained by the Decedent.

83. That at all times hereinafter mentioned, upon information and belief, Defendants assumed a strict products liability to persons using the subject Oxycodone, including Decedent,

who sustained injuries, harm and damages by reason of the use of subject product for purposes directly and indirectly advertised, marketed, and promoted by Defendants, including for the treatment of pain.

84. As a direct and proximate result of the Defendants' failure to warn, the Decedent died.  The Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

85. WHEREFORE, Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**COUNT V**
**FRAUDULENT MISREPRESENTATION**
**(AGAINST DEFENDANT KV PHARMACEUTICAL COMPANY)**

86. Plaintiff repeats, reiterates, and realleges paragraphs 1-45 of this Complaint with the same force and effect as if fully set forth herein.

87. The Defendant, KV PHARMACEUTICAL COMPANY, falsely and fraudulent represented to the medical and healthcare community, to the Decedent, the FDA and/or the public in general that the Defendant's products, including the subject Oxycodone, were manufactured under current Good Manufacturing Practices and in accordance with all federal regulations.

88. The Defendant falsely and fraudulently misrepresented both affirmatively and by omission to the medical and healthcare community, the Decedent, the FDA and/or the public in general that the Defendant's products, including Oxycodone, were of good quality, non-defective and safe and were manufactured in compliance with all federal and state regulations. See Composite Exhibit A.   These representations have been posted on the internet and

**Page 18 of 40**

elsewhere beginning at least as early as 2006 and continued until the products were recalled from the market.

89. KV Pharmaceutical Company, ETHEX Corporation and Ther-Rx Corporation touted on their websites and elsewhere that they are "committed to compliance with federal, state, and local laws and regulations in all facets of their corporate activities" and that because of that commitment, the Defendant produce "high quality products ….in full compliance with all applicable requirements and authorities."  See KV Pharmaceutical Company Compliance Program Description[1] attached as Exhibit B.

90. On or about March 28, 2008, the Defendant falsely and fraudulently misrepresented to the Decedent and her prescribing physician that the Oxycodone manufactured by Defendant and sold to the Decedent contained 30 MG of Oxycodone HCL and, further, misrepresented both affirmatively and by omission that the tablets sold to Decedent were of good quality, non-defective, safe and met the federal standards for safety, efficacy and product quality.

91. These statements referenced above were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:

   a)  that KV's manufacturing facilities were in disarray resulting in the manufacture of unsafe drug products that would have to be recalled due to the fact that they may contain oversized tablets.  Oversized tablets may contain more than the intended levels of the active drug ingredient, which could result in patients receiving as much as twice the expected dosage of these drugs;

---

[1] http://web.archive.org/web/20070710024748/www.kvpharmaceutical.com/KV_Compliance.pdf

b)  that KV's management engaged in misconduct by failing to recall the Company's unsafe drug products;

c)  that KV's manufacturing facilities failed to comply with federal regulations including FDA requirements and guidelines, generally referred to as current "Good Manufacturing Practices;"

d)  that from at least April 2007 through March 26, 2008 (just two days prior to Decedent's purchase of the defective Oxycodone) the FDA conducted inspections of the Defendants' manufacturing plants and found that the companies had been violating the FDA's current Good Manufacturing Practice regulations.  See Composite Exhibit C.

e)  On December 15, 2008 through February 2, 2009, the FDA conducted inspections of ten KV manufacturing facilities and made the following observations:

   1)  The responsibilities and procedures applicable to the quality control unit are not fully followed;

   2)  Control procedures are not established which validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug product;

   3)  Written records are not always made of investigations into unexplained discrepancies and the failure of a batch or any of its components to meet specifications;

   4)  Written records of investigations into unexplained discrepancies and the failure of a batch or any of its components to meet specifications do not always include the conclusions and follow-up;

   5)  Investigations of an unexplained discrepancy and a failure of a batch of any of its components to meet any of its specifications did not extend to other batches of the same product and other drug products that may have been associated with a specific failure or discrepancy;

**Page 20 of 40**

6) There is a failure to thoroughly review any unexplained discrepancy and the failure of a batch or any of its components to meet any of its specifications whether or not the batch has been already distributed;

7) An NDA-Field Report was not submitted within three working days of receipt of information concerning a failure of one or more distributed batches of a drug to meet the specifications established for it in the application;

8) An annual report did not include a full description of the manufacturing and control changes not requiring a supplemental application, listed by date in the order in which they were implemented;

9) Drug product production and control records are not reviewed and approved by the quality control unit to determine compliance with all established, approved written procedures before a batch is released or distributed;

10) Rejected closures are not controlled under a quarantine system designed to prevent their use in manufacturing or processing operations for which they are unsuitable;

11) Returned drug products held, stored or shipped before or during their return under conditions which cast doubt on their safety, identify, strength, quality or purity are not destroyed;

12) Procedures describing the handling of all written and oral complaints regarding a drug product are not followed;

13) Changes to written procedures are not reviewed and approved by the quality control unit;

14) Inspection of the packaging facilities immediately before use is not done to assure that all drug products have been removed from previous operations.  Specifically, line clearance practices are deficient.  Nearly 100 NCRs document "Foreign" tablets and other materials found in rooms and on packaging lines during 2007, despite SOPs and work instructions which outline and define pre- and post-inspection procedures;

15) Examination of packaging and labeling materials for suitability and correctness before packaging operations is not performed;

**Page 21 of 40**

16) Equipment and utensils are not cleaned, maintained, and sanitized at appropriate intervals to prevent contamination that would alter the safety, identity, strength, quality or purity of the dru g product;

17) Routine calibration of automatic, mechanical, and electronic equipment is not performed according to a written program designed to assure proper performance;

18) Records are not kept for the cleaning and inspection of equipment;

19) Procedures for the cleaning and maintenance are deficient regarding sufficient detail of the methods, equipment, and materials used in the cleaning and maintenance operation, and the methods of disassembly and reassembling equipment as necessary to assure proper cleaning and maintenance;

20) Written records of major equipment cleaning, maintenance, and use are not included in individual equipment logs;

21) Written procedures are not established and followed for the cleaning and maintenance of equipment, including utensils, used in the manufacture, processing, packaging or holding or a drug product;

22) The building lacks adequate space for the orderly placement of equipment and materials to prevent mix-ups between different components, in-process materials, and drug products to prevent contamination;

23) The written stability program does not assure testing of the drug products in the same container-closure system as that in which the drug product is marketed;

24) Laboratory records do not include the initials or signature of a second person showing that the original records have been reviewed for accuracy, completeness, and compliance with established standards;

25) Verification of the suitability of the testing methods is deficient in that they are not performed under actual conditions of use;

26) Reports of analysis from component suppliers are accepted in lieu of testing each component for conformity with all appropriate written specifications, without establishing the reliability of the supplier's analyses through appropriate validation of the supplier's test results at appropriate intervals;

**Page 22 of 40**

27) Complete records are not maintained of any modification of an established method employed in testing;

28) Established laboratory control mechanisms are not followed;

29) Laboratory records do not include complete records of the periodic calibration of laboratory instruments;

30) Laboratory records are deficient in that they do not include a complete record of all data obtained during testing;

31) There is a lack of rotation so that the oldest approved stock of components is used first;

32) Laboratory controls do not include the establishment of scientifically sound and appropriate sampling plans designed to assure that components conform to appropriate standards of identity, strength, quality and purity;

33) Written production and process control procedures are not followed in the execution of production and process control functions;

34) All processing lines used during the production of a batch of drug product is not properly identified at all times to indicate the phase of processing of the batch;

35) Batch production and control records do not include the identification of the persons performing each significant step in the operation, for each batch of drug product produced.

For greater detail of the FDA's inspection and observations, see Form FDA 483 (Dec. 15, 2008 – Feb. 2, 2009) attached as Exhibit D, and incorporated by reference herein.

92. During its inspection, the FDA found that certain devices were missing from the press machines that, along with the above-enumerated observations, resulted in the creation of oversized tablets. The machines lacked tail-over die covers, as well as lower punch retainer clips which created a larger cavity to fill. The machine also lacked time auto-rejection at start up which diverts everything from the die table to a reject chute. The machine did not have a

back-up chute sensor that would provide an automatic shutdown of the press when the tablets back up from the chute leading to the deduster and could be introduced into the blend or die cavities.  The FDA observed that some machine press operators failed to segregate start-up waste which created a situation where in some instances, the material was intermingled with good product.  The company has taken remedial measures to fix the product defects, which include:  the compression equipment is now retrofitted with tail-over die covers and lower punch retainer clips in order to prevent potential for die overfilling.  Fully automated reject mechanisms are being fabricated and installed on the presses.  Back-up chute sensors are being fabricated and installed on the presses.  Procedure controls were added which require the operator to discard start-up waste from the tablet press immediately off of the press discharge chute.

93. When the above representations were made by Defendant, it knew those representations to be false and they willfully, wantonly, and recklessly disregarded whether the representations were true.

94. These affirmative misrepresentations and omissions were made by Defendants with the intent of defrauding and deceiving the Decedent, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, dispense and/or purchase said product Oxycodone for the treatment of pain, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Decedent.

95. Defendant knew these representations would induce healthcare providers, including Decedent's physician to prescribe and for consumers, including Decedent, to use the Defendant's Oxycodone. In fact, in a document posted on Defendant's own website in 2007, the Defendant stated "[w]e [KV, ETHEX and Ther-Rx] are committed to producing high quality products and providing high quality services in full compliance with all applicable requirements and authorities….A commitment to compliance is also good business: ***customers and suppliers not only expect companies to have effective compliance programs, but frequently take a company's commitment to compliance into account when deciding whether to do business with that firm.***" See Exhibit B at p. 2 (emphasis added).

96. At the time the aforesaid representations were made by the Defendants and, at the time the Decedent used Oxycodone, the Decedent was unaware of the falsity of said representations and reasonably believed them to be true.

97. In reliance upon said representations, the Decedent was induced to, and did, purchase and use Oxycodone, which resulted in Decedent's death.

98. Said Defendants knew, and were aware, or should have been aware, that Oxycodone had not been manufactured under current Good Manufacturing Practices, was defectively manufactured, lacked adequate and/or sufficient warnings, and was not of the quality represented by the Defendant.

99. Defendant knew, or should have known, that Oxycodone had a potential to, could, and would cause severe and grievous injury to the users of said product.

100. Defendants brought Oxycodone to the market and acted fraudulently, wantonly, and maliciously to the detriment of the Decedent.

101.   As a direct and proximate result of the forgoing, Decedent died.

102.   WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### COUNT VI
### FRAUDULENT MISREPRESENTATION
### (AGAINST DEFENDANT ETHEX CORPORATION)

103.   Plaintiff repeats, reiterates, and realleges paragraphs 1-45 of this Complaint with the same force and effect as if fully set forth herein.

104.   The Defendant, ETHEX, falsely and fraudulent represented to the medical and healthcare community, to the Decedent, the FDA and/or the public in general that the Defendant's products, including the subject Oxycodone, were manufactured under current Good Manufacturing Practices and in accordance with all federal regulations.

105.   The Defendant falsely and fraudulently misrepresented both affirmatively and by omission to the medical and healthcare community, the Decedent, the FDA and/or the public in general that the Defendant's products, including Oxycodone, were of good quality, non-defective and safe and were manufactured in compliance with all federal and state regulations. See Composite Exhibit A.   These representations have been posted on the internet and elsewhere beginning at least as early as 2006 and continued until the products were recalled from the market.

106.   KV Pharmaceutical Company, ETHEX Corporation and Ther-Rx Corporation touted on their websites and elsewhere that they are "committed to compliance with federal, state, and local laws and regulations in all facets of their corporate activities" and that because

of that commitment, the Defendants produce "high quality products ….in full compliance with all applicable requirements and authorities."  See KV Pharmaceutical Company Compliance Program Description[2] attached as Exhibit E.

107.   On or about March 28, 2008, the Defendant, through the product label/insert, falsely and fraudulently misrepresented to the Decedent and her prescribing physician that the Oxycodone manufactured by Defendant and sold to the Decedent contained 30 MG of Oxycodone HCL and, further, misrepresented both affirmatively and/or by omission that the tablets sold to Decedent were of good quality, non-defective, safe and met the federal standards for safety, efficacy and product quality.  See Product Insert attached as Exhibit F.

108.   These statements referenced above were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:

   f)   that KV's manufacturing facilities were in disarray resulting in the manufacture of unsafe drug products that would have to be recalled due to the fact that they may contain oversized tablets.  Oversized tablets may contain more than the intended levels of the active drug ingredient, which could result in patients receiving as much as twice the expected dosage of these drugs;

   g)   that KV's management engaged in misconduct by failing to recall the Company's unsafe drug products;

---

[2] http://web.archive.org/web/20070115220409/www.ethex.com/pages/ETHEX_Compliance.pdf

h)  that KV's manufacturing facilities failed to comply with federal regulations

   including FDA requirements and guidelines, generally referred to as current

   "Good Manufacturing Practices;"

i)  that from at least April 2007 through March 26, 2008 (just two days prior to

   Decedent's purchase of the defective Oxycodone) the FDA conducted inspections

   of the Defendants' manufacturing plants and found that the companies had been

   violating the FDA's current Good Manufacturing Practice regulations.  See

   Composite Exhibit C.

j)  On December 15, 2008 through February 2, 2009, the FDA conducted inspections

   of ten KV manufacturing facilities, including manufacturing facilities operated by

   ETHEX, and made the following observations:

   36) The responsibilities and procedures applicable to the quality control unit
       are not fully followed;

   37) Control procedures are not established which validate the performance of
       those manufacturing processes that may be responsible for causing
       variability in the characteristics of in-process material and the drug
       product;

   38) Written records are not always made of investigations into unexplained
       discrepancies and the failure of a batch or any of its components to meet
       specifications;

   39) Written records of investigations into unexplained discrepancies and the
       failure of a batch or any of its components to meet specifications do not
       always include the conclusions and follow-up;

   40) Investigations of an unexplained discrepancy and a failure of a batch of
       any of its components to meet any of its specifications did not extend to
       other batches of the same product and other drug products that may have
       been associated with a specific failure or discrepancy;

**Page 28 of 40**

41) There is a failure to thoroughly review any unexplained discrepancy and the failure of a batch or any of its components to meet any of its specifications whether or not the batch has been already distributed;

42) An NDA-Field Report was not submitted within three working days of receipt of information concerning a failure of one or more distributed batches of a drug to meet the specifications established for it in the application;

43) An annual report did not include a full description of the manufacturing and control changes not requiring a supplemental application, listed by date in the order in which they were implemented;

44) Drug product production and control records are not reviewed and approved by the quality control unit to determine compliance with all established, approved written procedures before a batch is released or distributed;

45) Rejected closures are not controlled under a quarantine system designed to prevent their use in manufacturing or processing operations for which they are unsuitable;

46) Returned drug products held, stored or shipped before or during their return under conditions which cast doubt on their safety, identify, strength, quality or purity are not destroyed;

47) Procedures describing the handling of all written and oral complaints regarding a drug product are not followed;

48) Changes to written procedures are not reviewed and approved by the quality control unit;

49) Inspection of the packaging facilities immediately before use is not done to assure that all drug products have been removed from previous operations.  Specifically, line clearance practices are deficient.  Nearly 100 NCRs document "Foreign" tablets and other materials found in rooms and on packaging lines during 2007, despite SOPs and work instructions which outline and define pre- and post-inspection procedures;

50) Examination of packaging and labeling materials for suitability and correctness before packaging operations is not performed;

**Page 29 of 40**

51) Equipment and utensils are not cleaned,  maintained, and sanitized at appropriate intervals to prevent contamination that would alter the safety, identity, strength, quality or purity of the dru g product;

52) Routine calibration of automatic, mechanical, and electronic equipment is not performed according to a written program designed to assure proper performance;

53) Records are not kept for the cleaning and inspection of equipment;

54) Procedures for the cleaning and maintenance are deficient regarding sufficient detail of the methods, equipment, and materials used in the cleaning and maintenance operation, and the methods of disassembly and reassembling equipment as necessary to assure proper cleaning and maintenance;

55) Written records of major equipment cleaning, maintenance, and use are not included in individual equipment logs;

56) Written procedures are not established and followed for the cleaning and maintenance of equipment, including utensils, used in the manufacture, processing, packaging or holding or a drug product;

57) The building lacks adequate space for the orderly placement of equipment and materials to prevent mix-ups between different components, in-process materials, and drug products to prevent contamination;

58) The written stability program does not assure testing of the drug products in the same container-closure system as that in which the drug product is marketed;

59) Laboratory records do not include the initials or signature of a second person showing that the original records have been reviewed for accuracy, completeness, and compliance with established standards;

60) Verification of the suitability of the testing methods is deficient in that they are not performed under actual conditions of use;

61) Reports of analysis from component suppliers are accepted in lieu of testing each component for conformity with all appropriate written specifications, without establishing the reliability of the supplier's analyses through appropriate validation of the supplier's test results at appropriate intervals;

62) Complete records are not maintained of any modification of an established method employed in testing;

63) Established laboratory control mechanisms are not followed;

64) Laboratory records do not include complete records of the periodic calibration of laboratory instruments;

65) Laboratory records are deficient in that they do not include a complete record of all data obtained during testing;

66) There is a lack of rotation so that the oldest approved stock of components is used first;

67) Laboratory controls do not include the establishment of scientifically sound and appropriate sampling plans designed to assure that components conform to appropriate standards of identity, strength, quality and purity;

68) Written production and process control procedures are not followed in the execution of production and process control functions;

69) All processing lines used during the production of a batch of drug product is not properly identified at all times to indicate the phase of processing of the batch;

70) Batch production and control records do not include the identification of the persons performing each significant step in the operation, for each batch of drug product produced.

For greater detail of the FDA's inspection and observations, see Form FDA 483 (Dec. 15, 2008 – Feb. 2, 2009) attached as Exhibit D, and incorporated by reference herein.

109. During its inspection, the FDA found that certain devices were missing from the press machines that, along with the above-enumerated observations, resulted in the creation of oversized tablets. The machines lacked tail-over die covers, as well as lower punch retainer clips which created a larger cavity to fill.  The machine also lacked time auto-rejection at start up which diverts everything from the die table to a reject chute.  The machine did not have a

**Page 31 of 40**

back-up chute sensor that would provide an automatic shutdown of the press when the tablets back up from the chute leading to the deduster and could be introduced into the blend or die cavities.  The FDA observed that some machine press operators failed to segregate start-up waste which created a situation where in some instances, the material was intermingled with good product.  The company has taken remedial measures to fix the product defects, which include:  the compression equipment is now retrofitted with tail-over die covers and lower punch retainer clips in order to prevent potential for die overfilling.  Fully automated reject mechanisms are being fabricated and installed on the presses.  Back-up chute sensors are being fabricated and installed on the presses.  Procedure controls were added which require the operator to discard start-up waste from the tablet press immediately off of the press discharge chute.

110.   When the above representations were made by Defendant, it knew those representations to be false and willfully, wantonly, and recklessly disregarded whether the representations were true.

111.   These affirmative misrepresentations and omissions were made by Defendant with the intent of defrauding and deceiving the Decedent, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, dispense and/or purchase said product Oxycodone for the treatment of pain, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Decedent.

112.    Defendant knew these representations would induce healthcare providers, including Decedent's physician to prescribe and for consumers, including Decedent, to use the Defendant's Oxycodone.  In fact, in a document posted on Defendant's own website in 2007, the Defendant stated "[w]e [KV, ETHEX and Ther-Rx] are committed to producing high quality products and providing high quality services in full compliance with all applicable requirements and authorities….A commitment to compliance is also good business: ***customers and suppliers not only expect companies to have effective compliance programs, but frequently take a company's commitment to compliance into account when deciding whether to do business with that firm.***" See Exhibit B at p. 2 (emphasis added).

113.    At the time the aforesaid representations were made by the Defendant and, at the time the Decedent used Oxycodone, the Decedent was unaware of the falsity of said representations and reasonably believed them to be true.

114.    In reliance upon said representations, the Decedent was induced to, and did, purchase and use Oxycodone, which resulted in Decedent's death.

115.    Said Defendant knew, and was aware, or should have been aware, that Oxycodone had not been manufactured under current Good Manufacturing Practices, was defectively manufactured, lacked adequate and/or sufficient warnings, and was not of the quality represented by the Defendant.

116.    Defendant knew, or should have known, that Oxycodone had a potential to, could, and would cause severe and grievous injury to the users of said product.

117.    Defendant brought Oxycodone to the market and acted fraudulently, wantonly, and maliciously to the detriment of the Decedent.

**Page 33 of 40**

118.   As a direct and proximate result of the forgoing, Decedent died.

119.   WHEREFORE, Plaintiff demands judgment against Defendant ETHEX for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**COUNT VII**
**UNJUST ENRICHMENT**
**(AGAINST DEFENDANTS KV PHARMACEUTICAL COMPANY, ETHEX**
**CORPORATION AND THER-RX CORPORATION)**

120.   Plaintiff repeats, reiterates, and realleges paragraphs 1-45 of this Complaint with the same force and effect as if fully set forth herein.

121.   As an intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from the purchases of the subject Oxycodone product by Decedent.

122.   Defendants have voluntarily accepted and retained these profits and benefits, derived from the Decedent and others, with full knowledge and awareness that, as a result of Defendants' fraud and other conscious and intentional wrongdoing, Decedent did not receive a product of the quality, nature or fitness that had been represented by Defendants or that Decedent, as a reasonable consumer, expected.

123.   By virtue of the conscious wrongdoing alleged in this Complaint, Defendants have been unjustly enriched at the expense of the Decedent, who is entitled to it in equity, and hereby seeks the disgorgement and restitution of Defendants' wrongful profits, revenue and benefits, to the extent, and in the amount, deemed appropriate by the Court; and such other relief as this Court deems just and proper to remedy the Defendants' unjust enrichment.

124.   WHEREFORE,   Plaintiff   demands   judgment   against   Defendants   for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**COUNT VIII**
**WRONGFUL DEATH**
**(AGAINST DEFENDANTS KV PHARMACEUTICAL COMPANY, ETHEX**
**CORPORATION AND THER-RX CORPORATION)**

125.   Plaintiff repeats, reiterates, and realleges paragraphs 1-45 of this Complaint with the same force and effect as if fully set forth herein.

126.   The beneficiaries of the ESTATE of JENNY MILLER may include Decedent's surviving parents, FRANCES and STEVEN MILLER, as well as Decedent's two surviving children, KML and MEW, III, both minors.

127.   At all times material hereto, Defendants owed a duty to JENNY MILLER to protect deceased against reasonably foreseeable harms which a prudent person would anticipate were likely to result from the Defendants' acts or omissions.

128.   Defendants breached that duty when they acted in a negligent and/or tortious manner as set forth herein.

129.   The death of JENNY MILLER was directly and proximately caused by Defendants' wrongful act, negligence or default.

130.   If death had not ensued, JENNY MILLER would have been entitled to maintain a cause of action and recover damages against Defendants because of the above alleged negligent and tortious conduct.

131.   As a direct, foreseeable and proximate result of Defendants' conduct, Decedent's estate has incurred medical and funeral expenses.

132.    Plaintiff seeks damages including all such damages available within a wrongful death statute and expressly incorporated within this count.

133.    WHEREFORE, Plaintiff, individually, and on behalf of all wrongful death beneficiaries, including Decedent's surviving parents and two surviving children, demands judgment for wrongful death damages in an amount to be determined by a jury, including but not limited to:

a.   As to the surviving parents and two surviving children of JENNY MILLER (the "wrongful death beneficiaries"), they demand damages, including, but not limited to, lost support and services; loss of decedent's companionship and protection; mental pain and suffering; lost parental companionship, instruction, and guidance; and medical and funeral expenses;

b.   As to the Estate of JENNY MILLER, Plaintiff seeks damages including, but not limited to, loss of net accumulations; decedent's lost earnings; and decedent's medical and funeral expenses; and

c.   Such other and further relief under all applicable state and federal law and any other relief the Court deems just and appropriate.

**COUNT XI**
**LOSS OF CONSORTIUM**
**(AGAINST DEFENDANTS KV PHARMACEUTICAL COMPANY, ETHEX CORPORATION AND THER-RX CORPORATION)**

134.    Plaintiff repeats, reiterates, and realleges paragraphs 1-45 of this Complaint with the same force and effect as if fully set forth herein.

**Page 36 of 40**

135.  At all times material hereto, FRANCES and STEVEN MILLER were the parents of the Decedent, who lived and cohabited with the Decedent until the time of her death.

136.  At all times material hereto, KML and MEW, III were the children of the Decedent and, as such, lived and cohabited with the Decedent until the time of her death.

137.  By reason of the foregoing, Decedent's surviving parents have been caused, presently and in the future the loss of their minor daughter's companionship, services, and society and, as such, Decedent's surviving parents have been caused great mental anguish and suffering.

138.  Likewise, and by reason of the foregoing, Decedent's children has been caused, presently and in the future the loss of their mother's companionship, services, and society and, as such, both KML and MEW, III has been caused great mental anguish and suffering.

139.  WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT X
## WANTON AND WILLFUL CONDUCT
## (AGAINST DEFENDANTS KV PHARMACEUTICAL COMPANY, ETHEX CORPORATION AND THER-RX CORPORATION)

140.  Plaintiff repeats, reiterates, and realleges paragraphs 1-45 of this Complaint with the same force and effect as if fully set forth herein.

141.  At all times material, Defendants acted wantonly, willfully, maliciously and/or with reckless disregard for the safety of ultimate consumers of Oxycodone, including JENNY MILLER.  For instance, Defendants continued to manufacture its products, including its Oxycodone, after it knew the manufacturing plant had significant problems or deficiencies

**Page 37 of 40**

which were causing its products to be distributed with more of the active ingredients than appropriate.   Defendants withheld information concerning its defects in the manufacturing process from the general public, including Decedent, physicians, including Decedent's physicians, and the FDA.   Further, in light of the Defendants' knowledge that its drugs were manufactured defectively, Defendants failed to test its products appropriately to assure consumers, including Decedent, were not at risk of suffering serious injuries as a result of the ingestion of Defendants' defective products.   Moreover, even after the Defendants learned of significant manufacturing deficiencies that could cause drugs to be manufactured outside of the product specifications or could increase the likelihood that the subject product could be sold with more of the ingredient than intended, the Defendants ignored the identified problems and continued to sell their products to consumers notwithstanding the risks posed to potential consumers, including the risk of suffering serious injuries and, as in this case, death.

142.   The conduct of Defendants, as set forth herein, was so outrageous and improper as to constitute willful, wanton and reckless disregard for the safety of JENNY MILLER and the users and ultimate consumers of this product and as such Plaintiff is entitled to and hereby claim Punitive Damages in this action.

143.   WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against the Defendant as follows:

a.      Awarding actual damages to the Plaintiff incidental to the Decedent's purchase and use of Oxycodone in an amount to be determined at trial;

b.      Awarding treble and/or punitive damages to the Plaintiff;

c.      Awarding pre-judgment and post-judgment interest to the Plaintiff;

d.      Awarding the costs and the expenses of this litigation to the Plaintiff;

e.      All damages available under Florida's Wrongful Death Statute;

f.      Awarding reasonable attorneys' fees and costs to the Plaintiff as provided by law; and

g.      Granting all such other relief as Court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

144.   Plaintiff hereby demands a trial by jury on all Counts and as to all issues.

Date: March 5, 2010.


Respectfully submitted,


/s/ Douglass A. Kreis
Douglass A. Kreis (Fl. Bar: 129704)
Justin G. Witkin (Fl Bar: 0109584)
*Aylstock, Witkin, Kreis & Overholtz, PLLC*
803 N. Palafox Street
Pensacola, FL 32501
(850) 916-7450 Phone
(850) 916-7449 Facsimile
*Attorneys for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on this 5th day of March ,2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF:


                  /s/ Douglass A. Kreis
                  Douglass A. Kreis (Fl. Bar: 129704)